J-A26019-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| LOUIS CHARLES AIELLO | : | |
| Appellant | : | No. 1048 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 16, 2022
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0001512-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| LOUIS CHARLES AIELLO | : | |
| Appellant | : | No. 1049 EDA 2022 |

Appeal from the Judgment of Sentence Entered December 23, 2021
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0005006-2020

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| LOUIS CHARLES AIELLO | : | |
| Appellant | : | No. 1050 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 16, 2022
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0005021-2020

BEFORE: DUBOW, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED APRIL 10, 2024**

Louis Charles Aiello appeals from the judgment of sentence entered following his convictions at three docket numbers for numerous offenses related to the sexual abuse of children and for possession of child pornography. Aiello argues the charges should have been severed and the trial court erred in denying his motion to suppress, challenges the discretionary aspects of his sentence, and claims the Commonwealth presented insufficient evidence to support the trial court's finding that he was a sexually violent predator. We affirm.

Aiello was initially charged in June 2020 with sex crimes against two minors, D.S. and A.B. Aiello knew D.S. as the son of an acquaintance and he met A.B. at a wedding. Aiello was accused of numerous crimes: rape of a person less than 13 years of age; involuntary deviate sexual intercourse ("IDSI") with a person less than 13 years of age; indecent assault of a person less than 13 years of age; and two counts each of IDSI with a person less than 16 years of age, statutory sexual assault, corruption of minors, and indecent assault of a person less than 16 years of age.[1] The charges were at were at docket number CP-09-CR-5006-2020 ("Docket 5006").

He was later charged in September 2020 at a second docket number with crimes against three additional minors, R.C., C.A., and A.V. Two of the minors, R.C. and C.A. were Aiello's nephews. The third, A.V., was his

_____

[1] 18 Pa.C.S.A. §§ 3121(c), 3123(a)(6), 3126(a)(7), 3123(a)(7), 3122.1, 6301(a)(1), 3126(a)(8), respectively.

roommate's son. These charges were at docket number CP-09-CR-5021-2020 ("Docket 5021"). He was charged at this docket with many of the same crimes as at Docket 5006: rape of a person less than 13 years of age, IDSI with a person less than 13 years of age, indecent assault of person less than 13 years of age, statutory rape, statutory sexual assault, incest, IDSI with a person less than 16 years of age, indecent assault of a person less than 16 years of age, and two counts each of corruption of minors and indecent exposure.[2]

Aiello incurred a third set of charges in January 2021 based on child pornography that members of the Falls Township Police Department discovered when they executed a search warrant in June 2020. The pornography was found on electronic devices in Aiello's home. He was then charged at docket number CP-09-CR-1512-2021 ("Docket 1512") with two counts of possession of child pornography.[3]

Before trial, Aiello moved to sever the charges against each victim into separate trials and to suppress the evidence obtained pursuant to the search warrant. The Commonwealth countered with a motion to consolidate the dockets. At the hearing on the motions, the parties stipulated to the admission of the testimony from the preliminary hearing. N.T., June 16, 2021, at 32-35. The trial court summarized the facts as follows:

---

[2] 18 Pa.C.S.A. §§ 3121(c), 3123(b), 3126(a)(7), 3122 (repealed), 3122.1, 4302, 3123(a)(6), 3126(a)(8), 6301(a), and 3127, respectively.

[3] 18 Pa.C.S.A. § 6312(d).

[Aiello] is R.C.'s uncle (specifically, his step-father's brother). In 1993, when R.C. was 10 years old, R.C. and his younger brother, aged 6, visited [Aiello] at his trailer home in Bensalem. [Aiello] invited the boys to his home for a "fun night" of watching movies and playing with various "gizmos and gadgets" geared toward children. At the end of the night, [Aiello] told the boys it was time to shower before bed. Before the boys entered the shower, [Aiello] forced the boys to watch him masturbate. When the boys looked away, [Aiello] ordered them to "look, watch what I'm doing." After this incident, R.C. never visited the trailer home again, nor was he ever alone with [Aiello] again.

Two years later, in 1995, [Aiello] began to sexually abuse his other nephew, 8 year old C.A. The abuse always occurred at [Aiello's] residence at 408 Rumpf Avenue in Bucks County. [Aiello] would either go to C.A.'s house to pick him up or C.A. would be dropped off by a family member. On some occasions, C.A. spent the night. During the sexual abuse, [Aiello] would show C.A. pornography and then initiate sexual contact, all while talking as if "things were normal." [Aiello] would then proceed to use a bottle of oil to masturbate in front of C.A. and would attempt to have C.A. masturbate as well. [Aiello] performed oral sex on C.A. and coached C.A. to perform oral sex on [Aiello].

At one point, [Aiello] attempted to perform anal sex on C.A., but it was too painful for C.A. to continue, so C.A. instead performed anal sex on [Aiello]. After [Aiello] and C.A.'s sexual encounters, [Aiello] routinely took a shower and asked C.A. to do the same. [Aiello] also repeatedly encouraged C.A. to use enemas, and at one point, [Aiello] actually performed an enema on C.A.

On all of these occasions, C.A. and [Aiello] were alone. In 2000, C.A, turned 13 years old, and the sexual abuse ceased. After the abuse ended, C.A. knew [Aiello] spent time with someone known as E.E., the son of [Aiello's] then-girlfriend. . . .

In 2000, [C.A.] became too old for [Aiello's] continued victimization, [Aiello] began to sexually abuse an acquaintance's son, D.S. D.S's father worked as a wedding photographer while [Aiello] worked as a wedding disc jockey and karaoke host. [Aiello] met D.S. when he was 11 years

old. D.S. often spent time alone with [Aiello] and E.E. On one occasion, after [Aiello] returned from picking up D.S. and E.E. from their homes, they socialized for some time before [Aiello] brought the boys to his room. [Aiello] made the boys disrobe and showed them pornographic videos. [Aiello] asked the boys to masturbate one another. At one point, E.E. "backed off." [Aiello] then kissed D.S. and performed oral sex on him. D.S. recalled E.E. masturbating [Aiello]. According to D.S., Appellant "really, pushed the issue of an enema" and forced D.S. to give him an enema.

[Aiello] sexually abused D.S. whenever they were alone together. [Aiello] would display pornography on the television, then subsequently perform oral sex on D.S., and have D.S. perform oral sex on him. [Aiello] attempted to perform anal sex on D.S., but D.S. declined. However, [Aiello] forced D.S. to perform protected anal sex on him, while using massagers and oils. These acts occurred when D.S. was under the age of 13. D.S. was 17 years old when he last had sexual contact with [Aiello] in 2007.

From 2004 to 2006, [Aiello] began to sexually abuse A.V., the 8 year old son of his roommate . . . . One time, when A.V. was visiting their residence, [Aiello] approached A.V. and offered to show him the television show "Speed Racer." [Aiello] brought A.V. to his bedroom, and, while A.V. watched the television, [Aiello] asked if he could change clothes. As he did so, [Aiello] proceeded to ask: "So what do you think?" A.V. saw [Aiello] completely naked and then immediately left the room.

On another occasion, [Aiello] organized a sleepover with A.V. and [his roommate's] nephew in a tent in the backyard. That evening, [A.V.'s father] found the boys in "E.E.'s room"—a small crawl space in [Aiello's] room containing a television, posters, and comic books. Mr. Visco inquired as to what they were doing and [Aiello] replied that he was showing the boys "the crawl space where him and E.E., you know, spend time together, sleep together." At that point, suspecting something was amiss, [A.V.'s father] told [Aiello] that the sleepover was over and that he was taking the boys. [Aiello's] demeanor immediately changed; he became upset and angry that he had already set up a tent in the backyard for the sleepover. [A.V.'s father] moved out of [Aiello's] home shortly thereafter.

- 5 -

In 2007, [Aiello] ceased sexually abusing A.V., and turned to 13 year old A.B. [Aiello] met A.B. at A.B.'s sister's wedding. [Aiello] was working as a disc jockey and, A.B., who had a lifelong interest in music, enjoyed his first encounter with professional music equipment. As A.B. examined [Aiello's] music equipment, [Aiello] invited him to "become an assistant . . . in a business sense." It was through this arrangement that A.B. began to spend time alone with [Aiello]. On one occasion in 2007, A.B. was riding one of [Aiello's] dirt bikes on the road in front of [Aiello's] residence when he fell and scraped his hands. [Aiello] took A.B. inside his home under the guise of cleaning him up, but instead asked A.B. whether he had "ever gotten a hand job or a blow job" and removed A.B.'s pants. [Aiello] then retrieved a condom, put it on A.B., and began to masturbate him.

Following that assault, [Aiello] sexually abused A.B. "once or twice a month," all while A.B. was under the age of 16. [Aiello] would pick A.B. up at his house and bring him to his residence to watch movies in the bedroom. They would proceed to undress and engage in sexual acts, including A.B. performing oral sex on [Aiello], A.B. performing protected anal sex on [Aiello], and putting a condom on a "toy banana" to use as a dildo. One time, A.B. and [Aiello] traveled to a camp in upstate Pennsylvania for a Christian church band concert. After the concert, [Aiello] sexually assaulted A.B. in one of the cabins.

A.B. testified that, although he performed anal sex on [Aiello], [Aiello] attempted to perform anal sex on him but "more often than not [he] refused." [Aiello] also spoke to A.B. about another boy in his life, E.E., with whom [Aiello] shar[e]d a similar relationship. In 2011, A.B. reached the age of 17 and the sexual abuse stopped.

Trial Court Opinion, filed Nov. 22, 2022, at 3-6 (citations to record omitted).[4]

The trial court denied the motion to sever and the motion to suppress

_____

[4] The testimony from the preliminary hearing was admitted at the hearing on the pre-trial motions. A copy of the preliminary hearing transcript is not in the

*(Footnote Continued Next Page)*

- 6 -

and granted the Commonwealth's motion to consolidate. Following a stipulated bench trial, the court convicted Aiello of all counts.

The court sentenced Aiello in December 2021. At Docket 5021, the court sentenced Aiello to an aggregate sentence of 18 to 36 years' incarceration. At Docket 1512, the court sentenced Aiello to an aggregate sentence of six to 12 years' incarceration. At Docket 5006, the court sentenced him to an aggregate of 25 to 50 years' incarceration. The court ordered that the sentences were to run consecutively to each other, for a total aggregate sentence of 49 to 98 years' incarceration. The court held an SVP hearing, where the court heard testimony from a psychologist with the Sexual Offenders Assessment Board ("SOAB"), Dr. Kristen Dudley. Dr. Dudley testified as an expert in the assessment of adult sexual offenders and opined that Aiello met the criteria of a sexually violate predator ("SVP"). N.T., Dec. 23, 2021, at 14. The court found that Aiello was an SVP.

Aiello filed a motion for reconsideration of sentence. At Docket 5021, the court vacated its sentence and resentenced Aiello, but imposed the same aggregate sentence. The court clarified that it imposed some sentences consecutive to each other because "it was an ongoing situation over a period of years." N.T., Mar. 16, 2022, at 11. The court further noted that the sentence imposed "was consistent with the mandatory minimum sentences." *Id.* at 12.

_____

certified record. However, no one disputes the accuracy of the trial court's summary of the evidence. Furthermore, the court's recitation of the evidence is consistent with the summary provided by the Commonwealth at the stipulated bench trial.

The court pointed out that the crimes at Docket 5006 involved different people and times, and found they required separate sentences. The court reasoned, "You don't get to sexually assault one victim and then receive the same sentence to run concurrent with each victim." *Id.* At Docket 1512, the court vacated the sentence and ordered that the sentences at counts 1 and 2 run concurrently, rather than consecutively. That reduced the sentence to three to six years' incarceration, for a new aggregate total at all three dockets of 46 to 92 years' incarceration. Aiello filed a timely notice of appeal.[5]

Aiello raises the following issues:

> 1. Did the trial court err in consolidating criminal informations 5006-2020; 5021-2020; and 1512-2021 as there was no nex[u]s between the pornographic images found and the alleged acts that occurred during the periods of 1993 through 2011.
>
> 2. Did the trial court err in consolidating criminal informations 5006-2020; 5021-2020; and 1512-2021 as there was no continuous course of conduct as these allegations were distinct crimes and the consolidation prejudiced [Aiello] by bolstering the credibility of the Commonwealth's witness and bootstrapping [Aiello's] defenses as the defense to each victim may be inconsistent with each other.
>
> 3. Did the trial court err in failing to suppress the evidence gathered from a defective search warrant.
>
> 4. Did the trial court abuse its discretion in sentencing [Aiello] by imposing manifestly excessive sentences, failing to consider all relevant factors, failing to adequately state

---

[5] The Honorable Diane E. Gibbons presided over Aiello's trial and sentencing. She retired shortly after Aiello filed his concise statement of matters raised on appeal. The Honorable Wallace H. Bateman wrote the Rule 1925(a) opinion.

the reasons relied upon and relying on improper factors in imposing said sentence.

5. Did the trial court abuse its discretion in sentencing [Aiello] to lifetime registration.

Aiello's Br. at 7-8.

## I. Consolidation

In his first two issues, Aiello argues the trial court erred in granting the Commonwealth's motion to consolidate. He maintains the pornography charges were improperly consolidated with the sexual abuse charges because there was no connection between the pornographic images and the sexual abuse. In his view, "the evidence of possession of child pornography did not tend to prove a common plan, scheme or design embracing the commission of the child sex abuse crimes." Aiello's Br. at 21. He adds that the charge of possession of pornographic images is not rationally based on the same act or transaction as the child sex abuse claims. In his telling, the evidence of child pornography was in effect prohibited evidence of criminal propensity in the sex crime cases. He contends that A.B.'s report of seeing an image of a naked minor as Aiello's computer screen saver during Aiello's conduct against A.B. was not a proper basis to consolidate the pornography charges with the other cases. He argues that there was no evidence that any of the images found during the search were the image A.B. saw. Aiello further maintains that consolidating the cases "of recently discovered child pornography with child sexual assault that occurred over ten years ago, would be highly probative of the propensity to commit child sexual assault." *Id.* at 24.

Aiello further argues the court erred in consolidating the three dockets and in denying his motion to sever because the events underlying the cases did not form a continuous course of conduct.

As for consolidating the sex crimes cases, he argues the allegations constituted distinct crimes and he was prejudiced because consolidation effectively bolstered the credibility of the Commonwealth's witnesses. He also contends that consolidation impeded his presenting defenses to charges as to some victims that might have been inconsistent with defenses to charges relating to other victims. Aiello argues the allegations relating to A.V. and R.C. were distinct from those regarding D.S., A.B., and C.A. He states that A.V. reported a single incident in which Aiello exposed himself, and R.C. reported one instance where Aiello masturbated in front of him and his brother. In contrast, he states that D.S., A.B., and C.A. reported that Aiello masturbated himself and them, and had them masturbate him. He states they alleged he also attempted and had actual anal sex with D.S., A.B., and C.A.; performed oral sex on and received oral sex from them; and watched pornography with them. He maintains that the crimes against each victim were distinct from those against other victims, and consolidation resulted in evidence of crimes of acts against other victims serving as impermissible evidence of "his propensity to commit crimes of sexual contact with children, particularly sexual contact with a particular age group of a particular sex, boys in particular[.]" *Id.* at 28-29.

We review a trial court's decision to sever or consolidate charges for an abuse of discretion. *See Commonwealth v. Collins*, 703 A.2d 418, 422 (Pa. 1997).

Pennsylvania Rule of Criminal Procedure 582 governs the joinder of separate informations for trial and provides:

> (1) Offenses charged in separate indictments or informations may be tried together if:
>
> > (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
> >
> > (b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A)(1).

Rule 583 governs severance of offenses and provides:

> The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together.

Pa.R.Crim.P. 583.

"Under Rule 583, the prejudice the defendant suffers due to the joinder must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." *Commonwealth v. Dozzo*, 991 A.2d 898, 902 (Pa.Super. 2010) (citing *Commonwealth v. Lauro*, 819 A.2d 100, 107 (Pa.Super. 2003)). Rather, the prejudice required under Rule 583 is "that which would occur if the evidence tended to convict [the] appellant only by showing his propensity to commit crimes, or because the jury was

- 11 -

incapable of separating the evidence or could not avoid cumulating the evidence." *Id.* (quoting *Lauro*, 819 A.2d at 107).

The Pennsylvania Supreme Court in *Commonwealth v. Collins*, 703 A.2d 418, 422 (Pa. 1997), read Rules 582 and 583 together and determined that to decide whether to grant severance, courts must ask whether the evidence would be admissible in separate trials, the evidence is capable of separation by the jury, and the defendant will be unduly prejudiced if the offenses are tried together. *Commonwealth v. Ferguson*, 107 A.3d 206, 210-11 (Pa.Super. 2015).

Evidence of other crimes or bad acts is not admissible to prove that the defendant acted "in conformity with those acts or to demonstrate a criminal propensity." *Commonwealth v. Brown*, 52 A.3d 320, 325 (Pa.Super. 2012); Pa.R.E. 404(b). The evidence, however, may be admissible for another, proper purpose. *Brown*, 52 A.3d at 325. One such proper purpose is to demonstrate a common plan, motive, scheme, or intent. *Dozzo*, 991 A.2d at 902 (citation omitted).

Here, the trial court concluded consolidation was proper because the evidence would be admissible in separate trials to show a common plan, scheme or design:

> In the case at bar, the Court properly consolidated the cases because the evidence of each of the offenses was admissible, in that it tended to prove a common plan, scheme or design embracing the commission of the crimes. Moreover, had the matters been tried separately, the evidence of his crimes would have been admissible in each individual trial.

In making the determination for consolidation, the Court first considered the victims' ages. [Aiello] generally began abusing the victims when they were under 13 years old and ceased when they reached their mid to late teenage years. In 1993, [Aiello] sexually abused 10-year-old R.C. From 1995 to 2000, [Aiello] sexually abused C.A. between ages 8 and 13. From 2000 to 2007, [Aiello] sexually abused D.S. between ages 11 and 17. In 2006, [Aiello] sexually abused 10-year-old A.V. Further, the boys' age ranges throughout the years indicate that [Aiello's] abuse was continuous and ongoing, as he moved from one victim to the next, with some overlap.

Second, the Court considered how [Aiello] chose his victims. [Aiello] utilized his relation to the victims and their families to facilitate his abuse, having met his targets through his own family or by befriending the victims' families. [Aiello] is R.C.'s uncle. C.A. is [Aiello's] nephew. D.S. met [Aiello] through his father, who was a wedding photographer while [Aiello] was working as a wedding disc jockey and karaoke host. [Aiello] was a friend of A.V.'s grandmother and had lived with A.V.'s father from 2004 to 2006. A.B. met [Aiello] when [Aiello] was the-disc jockey at A.B.'s sister's wedding in 2007.

Third, the Court considered the location of the sexual abuse. Most of the abuse perpetrated by [Aiello] occurred at his home. R.C. was abused at [Aiello's] trailer home in Bensalem. C.A., D.S., A.V., and A.B. were abused at [Aiello's] residence. R.C., C.A., and A.B. all indicated that [Aiello] would pick them up from their homes and drive them to his residence.

Fourth, the Court considered the grooming techniques [Aiello] used on each victim. Multiple victims described the same pattern of grooming: [Aiello] would invite them, often to his home, to partake in various activities that would appeal to boys of their age, such as: watching television and movies, playing with various toys, backyard campouts, riding dirt bikes, and music disc jockeying. R.C. described how [Aiello] had invited him and his younger brother to his home for a "fun night" of watching movies and playing with various "gizmos and gadgets" that appealed to them at that age. C.A. shared that he helped [Aiello] purchase two dirt bikes in 2000. A.V. described the invitation to watch Speed

Racer in [Aiello's] bedroom when he was at the residence. He also described how [Aiello] showed him the crawlspace where E.E. slept. This crawlspace was filled with items that would appeal to a boy of his age: a television, posters, and comic books. A.V.'s father described an incident which occurred sometime in 2006 or 2007 when his son and nephew were 10 and 8 years old, respectively. [Aiello] asked A.V.'s father to invite the boys to sleep with him in a tent in the backyard. It was later that night when A.V.'s father discovered the boys in the aforementioned crawlspace with [Aiello] standing just outside. A.B. described his interest in music and disc jockey equipment and [Aiello's] subsequent invitation for him to become his "assistant" and spend time alone together. He described riding dirt bikes at [Aiello's] residence in 2007. He described how [Aiello] invited him over to his residence to watch movies before he abused him. He also described how [Aiello] invited him to attend a Christian church band concert in upstate Pennsylvania, after which, [Aiello] again abused him while watching a movie.

Fifth, the Court looked at the similarities in the victims' stories. The victims who testified in this matter, who had never met each other or knew of each other's existence, provided nearly [] identical accounts of [Aiello's] efforts to "test the waters" prior to engaging in sexual acts. [Aiello] exposed himself in his shower and masturbated in front of R.C. and R.C.'s younger brother under the guise of the boys needing to shower before bed. [Aiello] exposed himself to A.V. under the guise of changing his clothing while A.V. was watching television in his bedroom. [Aiello] showed C.A. pornography before initiating sexual contact and talked as if "things were normal." [Aiello] would then expose himself and begin masturbating with a bottle of oil. [Aiello] also showed D.S. and E.E. pornographic videos before asking the boys to masturbate one another. After A.B. scraped his hands when he fell off a dirt bike, [Aiello] assisted him with cleaning up, asked whether had "ever gotten a hand job or a blow job" and began removing A.B.'s pants.

Sixth, the Court examined the specific methods of sexual abuse. C.A. and D.S. both described [Aiello's] use of oils during the sexual abuse. [Aiello] masturbated in front of C.A., D.S., R.C., and R.C.'s younger brother. He then directed the victims to masturbate themselves. Following masturbation, [Aiello] performed oral sex on A.B., C.A., and

D.S., and had the boys perform oral sex on him. In the cases of A.B., C.A., and D.S., [Aiello] attempted to perform anal sex on them. Each of the boys objected when the experience became painful. [Aiello] then had the victims perform anal sex on him.

Further, multiple victims recounted [Aiello's] use of an enema. C.A. and D.S. both described how [Aiello] ritualistically encouraged them to give themselves enemas following the sexual assaults, with [Aiello] performing an enema on C.A. and D.S. performing an enema on [Aiello]. In the case of C.A., after [Aiello] and C.A. had sexual contact, [Aiello] routinely took a shower and encouraged C.A. to do the same.

Accordingly, the Court found the probative value in the consolidation of these offenses to be quite strong insofar as the victims' accounts were independently corroborative of each other. Having determined that the evidence of each of these offenses would be admissible in a separate trial for the others in that they support a common scheme, plan or design, the Court also considered, the possibility that a jury would be confused or unable to separate the evidence at trial. The Court found that the evidence was not particularly technical or complex and that the offenses were in fact distinct and occurred at different points in time, minimizing danger of confusion. The Court also took into account the fact that a curative and cautionary instruction would have been given to the jury. Therefore, [Aiello's] assertion that the Court erred in consolidating the informations is wholly without merit.

Rule 1925(a) Op. at 10-13 (citations to record omitted).

To the trial court's thorough analysis we add only that the images on which the child pornography charges were based depicted young boys, who looked like the victims, engaging in acts that mirrored the acts Aiello had the victims perform.

The trial court did not abuse its discretion in consolidating the informations for trial. The evidence related to each victim would have been

admissible in the trials for the other victims, as evidence of a common plan, scheme, or intent. The victims were similar in age, the location of the crimes was the same, and the grooming techniques and details of the crimes were similar. Further, the evidence of child pornography would have been admissible in the sex abuse trials. The images depicted young boys, as were the victims, and depicted sexual acts like those Aiello had the victims perform. For example, there was evidence that Aiello had victims perform enemas, and police found images of enemas on his laptop. Moreover, the evidence did not tend to suggest a conviction based only on his propensity to commit crimes. Rather, it was relevant to show a common design, plan, or scheme. In addition, the testimony of each victim was sufficiently distinct such that a fact finder would be capable of separating the evidence.

## II.    Search Warrant

In his third issue Aiello argues the trial court erred in denying his motion to suppress. He argues the warrant was based on stale information and was overbroad.

"[S]earch warrants may only issue upon probable cause and '[t]he issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.'" **Commonwealth v. Green**, 204 A.3d 469, 482 (Pa.Super. 2019) (quoting **Commonwealth v. Leed**, 186 A.3d 405, 413 (Pa. 2018)) (alteration in original). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information

are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Id.* (citation omitted).

"Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Id.* at 480. (quoting *Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010)). Where "the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts." *Id.* (citation and internal quotation marks omitted).

The Pennsylvania Supreme Court has further explained that:

> It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.
>
> . . .
>
> [Further,] a reviewing court [is] not to conduct a *de novo* review of the issuing authority's probable cause determination, but [is] simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant.

*Jones*, 988 A.2d at 655 (quoting *Commonwealth v. Torres*, 564 Pa. 86, 764 A.2d 532, 537–38, 540 (2001)) (alterations in original).

In June 2020, the police applied for a search warrant of Aiello's home. The warrant sought, among other things, "[p]hysical evidence of Aiello's sexual assault and exploitation of DS, AB, 'Bobby,' 'the neighborhood children,' or any other child including, but not limited to, enema equipment, camping equipment, pornography (adult or child), notes, diaries, memos, letters, records, receipts, papers, or other writings, photographs, videos, communication devices, including cellular phones and computers." Application for Search Warrant at ¶ 1. It further sought "[a]ny and all digital storage devices, including, but not limited to thumb drives, flash drives, and external drives" and "[a]ny and all documents and/or photographs consisting of written, printed, or electronically stored material related to the identities of additional victims, including but not limited to 'Bobby' and the 'neighborhood kids' and/or co-conspirators." *Id.* at ¶¶ 8-9. It further sought "[c]orrespondence, 'trophies,' grooming aids, or other items demonstrating an interest in the exploitation of children," and "[a]ny and all devices capable of connecting to the internet." *Id.* at ¶¶ 14-15.

The affidavit of probable cause detailed the background of the affiant—Detective Stephen Reeves of the Falls Township Police Department—and two co-affiants—Chief Sean Perry of the Penndel Borough Police Department and Lieutenant Robert M. Gorman of the Bucks County District Attorney's Office/Bucks County Detectives. It stated that Detective Reeves had received numerous in-service police trainings and had conducted "hundreds of criminal investigations including assault, armed robbery, homicide, rape, child abuse,

fraud, burglary, theft, missing persons and narcotics violations." Affidavit of Probable Cause at 1. Detective Reeves was a member of the Pennsylvania Internet Crimes Against Children Task Force and completed multiple on-line courses pertaining to sexual assault investigations.

The affidavit detailed the information received from D.S., including that Aiello spoke of an ex-girlfriend's son named "Bobby" and that Aiello sometimes abused D.S. and Bobby together. The affidavit further discussed information received from A.B. regarding the abuse and asserted that A.B. had stated that Aiello spoke about "Bobby," but A.B. had not met him. A.B. further said that Aiello spoke of relationships with "other neighborhood kids," and that Aiello told A.B. that he had taken nude photographs of Bobby and the "neighborhood kids" and that he saw a photograph of Bobby and Bobby's mother in Aiello's residence. A.B. also stated that, as recently as 2011, he saw a screen saver on Aiello's desktop computer that "depicted a naked 14 or 15-year old boy with minimal muscle tone and child-like features," and that "[t]he boy's penis was visible in the photo." *Id.* at 5.

The affidavit also stated that based on his training and experience, Detective Reeves was aware of traits and characteristics commonly found in those who collect child pornography. The affidavit identified such traits and characteristics as including that such individuals "maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit

behavior and desires," and that "[s]uch individuals rarely destroy these materials because of the psychological support they provide." *Id.* at 6. The affidavit elaborated that collectors of child pornography "rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft and damage, their collections of illicit materials." *Id.* The affidavit explained that "[i]n addition to the emotional value the images have to the collector the visual images are intrinsically valuable for trading and/or selling and therefore are rarely destroyed or deleted by the collector." *Id.* The affidavit further provided that child pornography collectors "often collect, copy, or maintain sexually explicit materials on digital storage devices which may consist of USB flash drives, thumb drives, and memory cards." *Id.* It stated that they also "often collect grooming aids and 'trophies' in the exploitation of children." *Id.*

The affidavit stated that, based on his training and experience, Detective Reeves was also aware of traits and characteristics found generally in those who sexually abuse children. Detective Reeves specified in the affidavit that "[t]hese individuals rarely, if ever, dispose of any materials that may aid them in perpetrating abuse, including documentation and contact information for victims," or "materials . . . known as 'trophies,'" which, in this case, would include photographs of "Bobby" or other neighborhood children. The affidavit stated that "[l]ocating photographs or any other identifying information of victims . . . would assist in this investigation." *Id.* at 7.

### A. Staleness

Aiello argues that the last alleged abuse occurred in 2010, with the last report of a pornographic image being seen at his residence happening in 2011. He therefore maintains that the search warrant, executed in June 2020, was based on stale information. He disputes the Commonwealth's argument that perpetrators of sexual abuse of children rarely, if ever, dispose of photographs of the children they victimize. He maintains there was no information that Aiello had been committing crimes for the nine and a half years before the search. He maintains there was no evidence of file sharing, that Aiello had physical pictures of child pornography, or that A.B. viewed pornographic images of the victims in this matter. Aiello further argues the lapse of nine and a half years would render whatever device had been used obsolete, and the search warrant "does [not] allege that that specific device is still in the home." Aiello's Br. at 33. He concludes "[a]s there was no continuous course of conduct for over nine and a half years, the affidavit of probable cause is based solely on stale information and must be suppressed." *Id.* at 33.

When determining whether a warrant is supported by probable cause, the "[a]ge of the information supporting a warrant application is a factor." *Green*, 204 A.3d at 484 (quoting *Leed*, 186 A.3d at 413) (alteration in original). "If the information is too old, it is stale, and probable cause may no longer exist." *Id.* (citation and quotation marks omitted). However, staleness "is not determined by age alone, as this would be inconsistent with a totality of the circumstances analysis." *Id.* (citation omitted).

- 21 -

In ***Commonwealth v. Gomolekoff***, 910 A.2d 710, 713-15 (Pa.Super. 2006), this Court rejected a staleness claim where police obtained a warrant nine and a half months after the defendant sent emails containing alleged child pornography. We noted that other courts had observed in other cases that "pedophiles rarely, if ever, dispose of child pornography" and that "[p]resumably individuals will protect and retain child pornography for long periods for time because it is illegal and difficult to obtain." ***Id.*** at 714 (quoting ***United States v. Zimmerman***, 277 F.3d 426, 434 (3d Cir. 2002)). We further pointed out that the affidavit in support of the warrant application in ***Gomolekoff*** stated that the affiant was aware due to training and experience that persons who use home computers tend to retain their files and data for extended periods. ***Id.***

In this case, there was a lengthy period between the last alleged abuse and when A.B. saw child pornography on Aiello's computer and the execution of the search. However, the affidavit of probable cause contained information that Aiello had sexually abused children and had possessed child pornography. It further stated that the affiant, based on his training and experience, knew that those who collect child pornography rarely, if ever, delete or destroy it, and those who commit sexual abuse of children rarely, if ever, dispose of material that would aid them in the commission of the assault, including trophies and identifying information. Here, the affidavit contained substantial evidence in the record supporting the decision to issue the warrant, as the

facts and circumstances would warrant a person of reasonable caution in the belief that a search should be conducted.

### B. Overbreadth

Aiello also maintains the search warrant was overbroad. He concedes that A.B. stated he observed what he believed to be a naked 14- or 15-year-old boy with "minimal muscle tone and child-like features" on Aiello's desktop computer. Aiello's Br. at 33. He also notes that the affidavit of probable cause states that the affiant "is aware of the following traits and characteristics commonly found to exist and be true in cases involving individuals who collect child pornography," but claims that none of the listed traits involve desktop computers. *Id.* at 33-34 (citation omitted). He argues that the search was based on information from a 10-year-old who "had an untrained eye, saw something that may have been child pornography on a desktop computer," and such information does not provide probable cause "to search every electronic device that might be found within the home." *Id.* at 35-36.

Article I, Section 8 of the Pennsylvania Constitution provides, in pertinent part: "[N]o warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be. . . ." Pa. Const. Art. I § 8. Thus, "a warrant must name or describe with particularity the property to be seized and the person or place to be searched." *Commonwealth v. Orie*, 88 A.3d 983, 1002 (Pa.Super. 2014) (quoting *Commonwealth v. Rivera*, 816 A.2d 282, 290 (Pa.Super. 2003)). "The particularity requirement prohibits a warrant that is not particular enough and

- 23 -

a warrant that is overbroad," which are separate, but related, issues. ***Id.*** (citation omitted). A warrant lacks sufficient particularity if it "authorizes a search in terms so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize." ***Id.*** (citation omitted). A warrant is unconstitutionally overbroad if it "authorizes in clear or specific terms the seizure of an entire set of items, or documents, many of which will prove unrelated to the crime under investigation." ***Id.*** at 1002-03 (citation omitted).[6]

Here, the warrant was not overbroad. It sought evidence, including child pornography, trophies, and identifying information for victims, and, although it permitted the seizure of devices, the search was limited to the items sought. That the device that initially held an image may no longer be available is irrelevant here, as digital material can be transferred between devices. The warrant described the physical devices and digital data for which there was probable cause as nearly as may be under the circumstances. ***Green***, 204 A.3d at 482.

### III.  Discretionary Aspects of the Sentence

Aiello next challenges the discretionary aspects of his sentence. There is no absolute right to appeal the discretionary aspects of a sentence.

---

[6] Pennsylvania's requirement that the warrant describe the items to be seized "as nearly as may be" is "more stringent" than the Fourth Amendment's requirement of particularity in the description. ***Orie***, 88 A.3d at 1003. It requires that the warrant "describe the items as specifically as is reasonably possible." ***Id.*** (quoting ***Rivera***, 816 A.2d at 290).

***Commonwealth v. Cartrette***, 83 A.3d 1030, 1042 (Pa.Super. 2013) (*en banc*). Rather, we follow a four-part analysis before addressing a challenge to discretionary aspects of sentence. We must determine whether the appellant: (1) filed a timely notice of appeal; (2) properly preserved the sentencing issue at sentencing or in a motion to reconsider or modify sentence; (3) included in the appellate brief a concise statement of reasons for seeking allowance of appeal; and (4) asserted a substantial question that the sentence is not appropriate under the Sentencing Code. ***See Commonwealth v. Austin***, 66 A.3d 798, 808 (Pa.Super. 2013); 42 Pa.C.S.A. § 9781(b). "[I]f the appeal satisfies each of these four requirements, we will then proceed to decide the substantive merits of the case." ***Id.*** (citation omitted).

All four requirements are met here. Aiello alleges he raises a substantial question that the trial court imposed a manifestly excessive sentence considering Aiello's lack of prior record or history of addiction and his rehabilitative needs. He further alleges he raises a substantial question because the trial court primarily relied on the nature of the crimes, and that the factors the court relied on were contrary to the fundamental norms underlying the sentencing process, that is, the defendant's rehabilitative needs and the protection of the public. The claims that the court relied on improper factors and imposed an excessive sentence without considering rehabilitative needs raise substantial questions. ***Commonwealth v. Snyder***, 289 A.3d 1121, 1126 (Pa.Super. 2023) (finding an excessive sentence claim coupled with a claim of disregard for appellant's "rehabilitative potential"

raises a substantial question); ***Commonwealth v. Crawford***, 254 A.3d 769, 782 (Pa.Super. 2021) (stating that a claim that the sentencing court relied on improper factors raises a substantial question). We will therefore now address Aiello's sentencing claim on the merits.

Sentencing is a matter vested in the sound discretion of the trial court, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. ***Commonwealth v. Gonzalez***, 109 A.3d 711, 731 (Pa.Super. 2015). "[A]n abuse of discretion is not shown merely by an error in judgment." ***Id.*** (citation omitted). "[T]he appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." ***Id.*** (citation omitted).

Aiello maintains the trial court abused its discretion because it "in fact gave [Aiello] a life sentence by running almost all counts consecutive to each other for an aggregate confinement of not less than [46] to [92] years in state prison." Aiello's Br. at 39. He points out that the trial court stated that the protection of the public required incarceration for the remainder of Aiello's natural life, as there was no chance of rehabilitation, but argues that the expert testimony at sentencing was that there was a possibility of rehabilitation through treatment, which Aiello had never received. He argues the trial court failed to "seriously consider" his rehabilitative needs and lack of prior record. He claims the court's "primary focus was the seriousness of the crime," which, he alleges, was in contravention of the sentencing code. ***Id.*** at

40. He argues the trial court imposed a manifestly excessive sentence, failed to consider all relevant factors, and failed to adequately state the reasons relied upon, and relied on improper factors.

Here, the trial court discussed the crimes and their continued impact on the victims. N.T., Dec. 23, 2021, at 69-71. It noted that Aiello had never taken responsibility for the crimes and showed no remorse. *Id.* at 71. The court stated it had read the character letters submitted on Aiello's behalf, but pointed out those people had never seen Aiello with the children. *Id.* at 72. It further stated that the court considered that Aiello "will continue to deny what is clear guilt, which means [he was] not a good candidate for treatment." *Id.* at 72-73. It therefore concluded that its "only other choice [was] to remove [him] from society." *Id.* at 73. The court concluded "I think that the protection of the community – there is no chance of rehabilitation of [Aiello] and so, therefore, the protection of the community requires that he be incarcerated for the remainder of his natural life." *Id.* at 74. Further, at the re-sentencing, the court clarified that there were multiple victims over a lengthy period, and the sentences reflected that.

The court considered not only the seriousness of the crimes and the impact on the victims and the need to protect the public, but also Aiello's character evidence and his rehabilitative needs. The court was not required to view the letters and his rehabilitative needs as Aiello would have liked. The court did not abuse its discretion when imposing sentence.

## IV.    SVP Designation

In his final issue, Aiello maintains the court erred when it found he was an SVP and therefore required to register as a sex offender for life. He argues the Commonwealth failed to demonstrate by clear and convincing evidence that Aiello had an increased likelihood of reoffense. He argues Dr. Dudley acknowledge some of the statutory factors did not apply (Aiello did not exceed the means necessary to achieve the offense, the offense did not include a display of unusual cruelty, and there was no evidence the victims were mentally challenged). He points out that Dr. Dudley further acknowledged Aiello did not have a prior record, and therefore had not previously had a sentence that required participation in any available programs. He also maintains Dr. Dudley said pedophilia can be controlled and that Aiello was at risk for reoffending but the risk could be managed.

In addition, although admitting that Dr. Dudley opined that Aiello met the criteria to be classified as an SVP, Aiello claims Dr. Dudley's testimony lacked an in-depth discussion of the basis for her opinion. Aiello argues that "while acknowledging that a number of statutory factors do not apply, Dr. Dudley merely indicated that [Aiello] would be at risk to reoffend." Aiello's Br. at 49. He argues the Commonwealth "failed to demonstrate any likelihood of reoffending, let alone an increased likelihood." *Id.* He further claims the court failed to consider the likelihood of reoffense, as it stated that there was no known cure for pedophilic disorder and Aiello therefore was a lifetime risk of reoffending.

We review an SVP designation to determine whether the Commonwealth presented clear and convincing evidence that the defendant meets the statutory definition of an SVP. **Commonwealth v. Hollingshead**, 111 A.3d 186, 189 (Pa.Super. 2015). "As with any sufficiency of the evidence claim, we view all evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth." **Id.** (quoting **Commonwealth v. Baker**, 24 A.3d 1006, 1033 (Pa.Super. 2011)).

To be classified as an SVP, the Commonwealth must prove by clear and convincing evidence that the defendant has "a mental abnormality or personality disorder that makes [him] likely to engage in predatory sexually violent offenses." 42 Pa.C.S.A. § 9799.12 ("Sexually violent predator"). The statute defines "mental abnormality" as "[a] congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." **Id.** ("Mental abnormality"). The defendant's conduct must also have been "predatory," which the statute defines as "[a]n act directed at a stranger or at a person with whom a relationship has been instituted, established, maintained, or promoted, in whole or in part, in order to facilitate or support victimization." **Id.** ("Predatory").

To determine whether the defendant meets the above definition, the SOAB evaluates the following factors, "which are mandatory and are designed as criteria by which the likelihood of reoffense may be gauged":

- 29 -

(1) Facts of the current offense, including:

    (i) Whether the offense involved multiple victims.

    (ii) Whether the individual exceeded the means necessary to achieve the offense.

    (iii) The nature of the sexual contact with the victim.

    (iv) Relationship of the individual to the victim.

    (v) Age of the victim.

    (vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.

    (vii) The mental capacity of the victim.

(2) Prior offense history, including:

    (i) The individual's prior criminal record.

    (ii) Whether the individual completed any prior sentences.

    (iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

    (i) Age.

    (ii) Use of illegal drugs.

    (iii) Any mental illness, mental disability or mental abnormality.

    (iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

42 Pa.C.S.A. § 9799.24(b); ***Commonwealth v. Morgan***, 16 A.3d 1165, 1168-69 (Pa.Super. 2011).

At sentencing, Dr. Dudley testified as an expert in the assessment of adult sexual offenders. N.T., Dec. 23, 2021, at 14. Dr. Dudley testified that there were multiple victims, with both "hands-on" offenses and possession of child pornography, and that the multiple victims established a pattern of behavior. *Id.* at 21. Further, she testified that the period during which the offenses occurred – over 16 years – was relevant because it demonstrated that the pattern was longstanding. *Id.* at 21-22. She testified that these two factors went "directly to the heart of the diagnostics." *Id.* at 22. She stated that to reach a conclusion that Aiello had pedophilia disorder, the evidence had to establish a "sexual attraction to children and acting on that attraction," and having multiple victims over a period of many years was an indication of attraction and acting on the impulse. *Id.*

Dr. Dudley testified that the factor regarding whether the individual exceeded the means necessary to achieve the offense was not relevant, as Aiello did not do anything more than necessary to gain compliance from his victims. *Id.* at 22-23. She said, however, that Aiello's relationship with the victims had significance because he had befriended some of the victims' families and gained access to the children, one of whom was a biological relative. *Id.* at 23-24. She explained that there was "a level of trust between the adults who were caring for these children and [] Aiello, and that increased his ability to be able to sexually abuse them." *Id.* at 24. She testified that the ages of the victims were between seven and 17. *Id.* Dr. Dudley testified that Aiello did not display unusual cruelty and there was no evidence that any

children had any mental deficits or limitations that would have increased their vulnerability. *Id.* at 24-25. She further testified that this was Aiello's first known offense, and therefore he had not completed prior sentences or available sexual offender programs. *Id.* at 25.

Dr. Dudley testified that Aiello was 32 years old when the abuse of children began. *Id.* at 25-26. He was therefore significantly older than his victims. *Id.* at 26. She testified that there was no evidence he was using illegal drugs or providing drugs to the victims. *Id.*

Dr. Dudley opined, to a reasonable degree of professional and psychological certainty, that Aiello had pedophilic disorder, which is a sexual attraction to juveniles and acting on that attraction. *Id.* at 27. She testified that with someone with pedophilic disorder, "the attraction to pubescent children . . . is immutable." *Id.* at 28. However, she testified that "acting on the urges[] can wax and wan[e] over time," and "is a lifelong condition that can be managed." *Id.* Dr. Dudley further testified that Aiello had a "lifelong risk of re-offense unless or until he receive[d] intensive sex-offender specific treatment because, while it is possible to control deviate sexual impulses with such treatment and motivation, . . . at present, there is no known cure." *Id.* at 29. She further testified there was research to support that offenders who sexually assault children and are in possession of child sexual exploitation material ("CSEM") "are more likely to re-offend compared to offenders who only possess CSEM or only sexually assault one child." *Id.* at 30.

Dr. Dudley thus testified that it was her opinion, to a reasonable degree of professional and psychological certainty, that Aiello demonstrated predatory behavior. *Id.* at 30. She based this opinion on the fact that Aiello was the uncle of one victim and friends with the families of several other victims and he "used those relationships to develop relationships with these children for . . . his own sexual gratification and sexually abused them." *Id.* at 31. Dr. Dudley concluded that it was her opinion, to a reasonable degree of profession and psychological certainty, that Aiello met the criteria to be designated as an SVP. *Id.* at 32.

Here, Dr. Dudley's testimony supported, by clear and convincing evidence, the court's finding that Aiello was an SVP. Neither the fact that some statutory factors were not relevant in this case, nor that Dr. Dudley stated that hypothetical treatment can in some cases help manage pedophiliac disorder, renders the evidence here insufficient. Rather, the evidence that the Commonwealth produced specific to Aiello regarding the applicable factors supported the court's finding.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/10/2024